**Jara O. SMITH, S.S. # 239–56–5683, Plaintiff,**

v.

**Margaret M. HECKLER or her successor in office, Secretary, United States Department of Health and Human Services, Defendant.**

**No. ST–C–84–226.**

United States District Court,
W.D. North Carolina,
Statesville Division.

Dec. 20, 1985.

Bryce O. Thomas, Jr., Hickory, N.C., for plaintiff.

Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C., for defendant.

McMILLAN, District Judge.

Jara O. Smith, plaintiff, was born on February 23, 1938. He has a high school education and has received technical training in auto and truck diesel repair (Tr. 32). From 1973 to December, 1980, Mr. Smith owned and operated his own mechanic shop (Tr. 37). He had worked steadily in auto repair before establishing his own business. On December 19, 1980, a power steering assembly weighing 135 to 155 pounds fell on Mr. Smith while he was working on it (Tr. 39). His back was injured. He states that he has been in constant pain since that accident. He had a prior history of back problems, including surgery in 1976 to correct a herniated spinal disc.

Plaintiff applied for Social Security disability benefits on March 29, 1982. This application was denied. Plaintiff applied again on July 21, 1983. After that application was also denied, Mr. Smith requested reconsideration. When the denial was affirmed, the plaintiff requested a hearing, which was held before Administrative Law Judge (ALJ) Charles Brown on April 12, 1984. On June 21, 1984, ALJ Brown found Mr. Smith ineligible for disability benefits. After properly pursuing his administrative appeals, Mr. Smith filed a complaint in this court on November 28, 1984, seeking judicial review of the denial of disability benefits.

## THE ALJ'S DECISION

The ALJ found that the medical evidence established that the plaintiff had a severe musculoskeletal impairment of the back. However, he believed that the symptomatology associated with plaintiff's back problem was not so severe as to preclude the performance of sedentary work. The ALJ found no decrease in strength or limitation of motion in plaintiff's lower extremities and stated that plaintiff could drive 45 min-

utes to an hour, perform household chores, and, based on observation of the plaintiff at the hearing, satisfactorily tolerate sitting. Despite plaintiff's treating physician's opinion that plaintiff is disabled, the ALJ found that Mr. Smith had the residual functional capacity to perform all the exertional requirements of sedentary work. The ALJ noted no non-exertional limitation affecting the assessment of Mr. Smith's residual functional capacity. Consequently, the ALJ ruled that the plaintiff was ineligible for disability benefits (Tr. 20).

## PLAINTIFF'S TESTIMONY AT THE HEARING

In January, 1973, plaintiff started his own business repairing forklifts and other material handling equipment (Tr. 37). On December 19, 1980, he was rebuilding the power steering assembly on a forklift. He had removed the steering box to work on it and was trying to put the unit back in when it fell. As he caught the slipping box, plaintiff felt his back being "pulled apart" (Tr. 39–40). On his doctor's advice, plaintiff spent the next four weeks in bed but felt no lessening of his back pain. In February, 1981, plaintiff was admitted to North Carolina Baptist Hospital in Winston-Salem, North Carolina, where a myelogram and other surgery were performed (Tr. 41–2). (Five years earlier, plaintiff had undergone surgery to repair two ruptured discs. After recuperating for six months, he was able to return to work full time (Tr. 42).)

Plaintiff described his understanding of his back problem as scar tissue and bone spurs pressing on the sciatic nerve causing nerve damage affecting his left leg, hip and foot (Tr. 42). Since his December, 1980, accident, he has experienced a burning and stinging sensation in his left hip with pain running down the outside of his leg and into his feet (Tr. 43). Plaintiff feels the pain in his back, left leg and foot all the time. Plaintiff describes the pain as medium to severe depending on the length of time he is up and active. When he lies down, his right foot also begins to hurt (Tr. 43).

To relieve his pain, plaintiff sought treatment at the Duke University Pain Management Clinic. Since June, 1983, plaintiff has used pain management techniques developed by the clinic. Plaintiff stays up for 45 minutes to an hour and lies down for a similar period as he goes through the day. This approach has "helped some" (Tr. 44). Plaintiff also keeps a log of his daily activities so that he can reduce his activity level if his pain increases (Tr. 44–5). Plaintiff stated that sometimes he "can't be up more than 10 minutes out of an hour without hurting," but he is trying to build up his tolerance by staying up longer each day (Tr. 45). However, if plaintiff does not follow the prescribed regimen of alternating between periods of rest and activity, he is sometimes unable to get out of bed for three or four days because of the severity of pain brought on by too much continuous activity (Tr. 46).

Plaintiff usually rises at 7:30 or 8:00 each morning and tries to fix breakfast or clean up the house a little. He then lies down for an hour. When he rises again he may then go out to visit his father for an hour and come home to lie down again for an hour. Although the plaintiff tries to do different household tasks, he does not lift anything weighing over five pounds and does only "small stuff" that he can complete in the short intervals he is up (Tr. 49–50). The plaintiff does not do the dishes, make the bed or carry out the trash; he does sometimes hang out some laundry for his wife (Tr. 55). Plaintiff also occasionally goes shopping for small items, such as a loaf of bread or gallon of milk (Tr. 61).

The plaintiff does drive, making one or two trips per day five days a week (Tr. 60). He is most comfortable when he drives his van, which has seats with arm rests that allow him to get "propped up to where it doesn't jiggle or move [his] back." He makes such trips within his activity time limits, never riding for more than 45 minutes to an hour. When he drives from his

home in Lenoir to the Duke Clinic, he breaks the trip with four or five rest stops, stopping every 25 to 30 minutes and spending 10 to 20 minutes out of the car (Tr. 51–53).

Plaintiff has great difficulty sleeping, often getting no sleep at all at night (Tr. 53). He stated: "I have ... cramps and pains in my legs and feet, throbbing like a real bad toothache ... I get up a lot of nights and have to go sit in the bathtub in hot water to keep my legs from hurting so bad ... I can sleep a couple of hours and have to get up and walk around before I can get back to sleep again" (Tr. 53–4). Plaintiff also stated:

"When I lay down of a night, my right foot goes to hurting. It doesn't hurt me during the day, but when I lay down, in a different position, it changes, and it makes my right foot go to hurting. And I have this shooting pain and the burning pains in the bottom of my heels. And then my left foot I have the burning in my hip ..., it starts out like I got a stone bruise in the bottom of my heel, and the longer I'm up, the worse it hurts. The less amount of weight that I'm able to put on my leg and foot. It gets to the point where I have to walk on my toe to keep from putting the weight onto the back of my foot. And the longer that I am [up] the worse it hurts."

(Tr. 56–7.)

Before his accident, the plaintiff worked eight to sixteen hours a day. Since the accident, he has tried to return to work but says "I may be able to work 20 or 15 minutes and I have to go lie down" (Tr. 57). Plaintiff added that he has "always been a doer" (Tr. 51) and says, "[I]t gets depressing. Because I would like to be able to work, it makes my day to be able to do and work. I like to work" (Tr. 58).

### MEDICAL EVIDENCE
### BEFORE THE ALJ

On August 21, 1976, Dr. Cortland Davis completed a North Carolina Baptist Hospital discharge summary on the plaintiff. Dr. Davis recorded that the plaintiff had a two-year history of back pain from an injury at work. Before his 1976 hospitalization, plaintiff had complained of increasing back pain radiating into his left buttocks and leg. On physical examination at that time, plaintiff displayed a limitation of forward flexion at approximately 50° and had a positive straight leg raising (SLR) test on the left at 30°. Dr. Davis found a vague hypoesthesia (numbness) to pinprick over the lateral aspect of the left leg and foot. Plaintiff's lumbar spine x-rays were normal with the exception of a narrowing at the L4–L5 intervertebral disc space. On August 9, 1976, Dr. Davis performed a lumbar myelogram, which revealed an extradural defect at L5 and L4 with a narrow canal (Tr. 131). On August 12, 1976, Dr. Davis performed a lumbar laminectomy at the L4–5 and L5–S1 level and removed an extruded disc at the L5–S1 level (Tr. 131).

After the December, 1980, accident, plaintiff returned to North Carolina Baptist Hospital and was admitted in February, 1981. Dr. Davis again attended the plaintiff and performed another myelogram as well as another lumbar laminectomy. Describing his surgical findings, Dr. Davis wrote:

"The S1 nerve root had a good bit of epidural scar and was kinked, and went down under the sacrum. We unroofed a portion of the sacrum ... There was only epidural scar. We tried to enter the interspace and found that it had collapsed down."

(Tr. 136.)

No recurrent disc problem was found. X-rays taken before surgery had showed the lumbosacral spine "with degenerative disease at L–4—L–5 with associated hypertrophic changes and stable slight retrolisthesis. Vertebral bodies of T–12 through L3 are slightly flattened" (Tr. 140). Dr. Davis's primary discharge diagnosis was lumbar spondylosis (Tr. 134). He noted that x-rays had demonstrated spondylosis and that "findings at the time of surgery consisted of dense scar encasing L5 nerve root on the left side" (Tr. 135). After surgery and upon discharge, plaintiff still com-

plained of persistent pain in the lower back and left hip (Tr. 135).

On March 26, 1981, plaintiff was re-admitted to North Carolina Baptist Hospital for further evaluation of back and leg pain. The admission notes compiled by Drs. Martin and Davis showed a positive straight leg raising test on left at 60° and noted sensation "intact to pinprick and proprioception except some diminished pinprick over the left lateral aspect of the left foot" (Tr. 161). A report on admission x-rays stated:

"There is marked narrowing and sclerosis at the L4–5 disc space which is consistent with severe degenerative disc disease. There is anterior wedging of T12 through L2 which is most likely post traumatic. There are large posterior osteophytes [bone spurs] at the L4–5 interspace. There is limited range of motion on flexion and extension views.

\* \* \* \* \* \*

"Lucent area just inferior to articular surface of right femoral head most likely represents degenerative cyst formation." (Tr. 152–3.)

On March 31, 1981, a physical therapist's report recorded that the plaintiff complained of increased pain upon repeated sitting and standing. The therapist remarked that the plaintiff was "very concerned about work limitations" (Tr. 151). In his discharge summary, dated April 1, 1981, Dr. Davis stated that he had consulted with Dr. Nicastro from Orthopedics and that Dr. Nicastro "felt that the patient had diffuse degenerative disc disease." Dr. Davis agreed with that diagnosis and recorded the other recommendations offered by Dr. Nicastro. These included use of an anti-inflammatory drug, refraining from work for three months, physical therapy and the use of a back brace and corset (Tr. 148).

Plaintiff returned to North Carolina Baptist Hospital from October 4 to October 9, 1981. His admission history states: "[P]atient says his present pain has been unchanged since his second operation and is worse with standing and sitting and is relieved by lying flat." Positive straight leg raising test on left at 40° was also noted (Tr. 175).

After several examinations, including a neuropsychological examination by Dr. Frank Wood (who indicated that there was a psychological component to the plaintiff's pain and recommended enrollment in a pain management group (Tr. 164)), plaintiff was discharged with a diagnosis of failed low back syndrome (Tr. 162).

During 1981 and 1982, Dr. Carey Walton saw the plaintiff many times in his office. On December 14, 1981, Dr. Walton recorded an impression of "chronic back syndrome ... apparent epidural scarring and may be some element of sacroiliac strain or pain." Dr. Walton noted:

"He is never comfortable. Sometimes better when he up stirring around and can't sit for long period of time. Drove to Charlotte Friday and this did him for the weekend. He is uncomfortable at rest and certainly if he doesn't change positions frequently. He is uncomfortable when he is up a great deal. Sitting it [sic] a great problem for him.

"Pain is primarily in his back and his left lower extremity to some extent on the right beginning to have difficulty at least ... Scar over the lumbosacral area from previous surgery and subcutaneous nodular densities are present particularly on the left. He is quite tender in the left lumbar area and pressure in the area on the left produces pain all the way down to his leg. He is tender also in the left sacroiliac space. Pin prick is less perceived on the left than on the right. Straight leg raising on the left at 45 degrees positive with pain to the lumbar area."

(Tr. 181.)

On December 21, 1981, Dr. Walton wrote, "As far as I'm concerned he is disabled. I think he will gradually improve, but that is to be seen." (Tr. 180.)

On January 25, 1982, Dr. Walton recorded:

"[H]e is quite tender over the [lumbo-sacral] area and across the sacroiliac spaces. Straight leg raising at 80 degrees on the left produced pain in the back as well as the hamstring on the left. Sensory modality with decreased pinprick perception in the left extremity and medially and laterally, particularly laterally. No atrophy that I can appreciate though I did not measure his legs. Reflexes, grade II at the left heel and grade 1½ at the right. He bends forward 30° only without having pain in his left leg."

(Tr. 180.)

At that time, Dr. Walton again diagnosed chronic back syndrome, but added "[H]e is somewhat depressed I think. In addition, he talks frequently of his pain problem, and, also, as I watched him walk, he limps and tends to drag the left leg and sort of a flat based gait." (Tr. 179.) On March 31, 1982, Dr. Walton stated plaintiff "is up and down all night long and pain is involving not only the left extremity but the right lower extremity as well whenever he tries to walk or when is recumbent ... it is getting worse ... he does walk with a limp." (Tr. 179.)

On April 15, 1982, a Social Security Administration consulting physician, R.S. Spain, examined the plaintiff. In evaluating the plaintiff's residual functional capacity, Dr. Spain found that the plaintiff had the following exertional limitations: During a normal working day, he could stand and/or walk 3 hours, sit up to 6 out of 8 hours, and lift/carry 10 pounds or less occasionally. Dr. Spain added that plaintiff had a limited capacity for pushing/pulling controls requiring more than negligible force, as he found plaintiff to be able only occasionally to use his left leg for pushing and pulling. Dr. Spain observed no non-exertional impairment although he did agree that plaintiff suffered from failed low back syndrome (Tr. 198–200).

From June 13, 1983, through July 2, 1983, plaintiff was a patient in the Clinical Specialty Unit at Duke University Medical Center and participated in the unit's pain management program (Tr. 211). Before he was admitted, the plaintiff was examined by Dr. Eileen Steinberger. In her "Pain Clinic Note," she stated:

"He now describes his pain as a dull hurt in the lower part of his back radiating to his left hip. He says that his hip feels as though it is on fire. A burning and stinging sensation goes down the outside of his left leg and into his foot into his first three toes. He has some tingling in this distribution also. He says that it feels as though the heels of both feet are sore and bruised. He describes his back pain as a 5–6 on a scale from 0–10, but says that his leg and hip pain is definitely the worst pain which he rates as an 8. He also has a sensation of numbness on the outside of his leg. The pain is aggravated by being up and around, walking, sitting and standing. It is helped when he lays down.

\*    \*    \*    \*    \*    \*

"Patient has a normal gait and is able to get up on his heels and toes without difficulty. There is no pain on palpation of his back. He is able to forward flex so that his finger tips reach below his knees. He does have paraspinal muscle spasms. He has some pain on straight leg raising on the left at 70°. He has decreased pinprick in the distribution on S1 on the left."

(Tr. 219.)

Dr. Steinberger believed plaintiff demonstrated failed disc syndrome and advised that he be admitted to the pain management program (Tr. 219).

On June 14, 1983, plaintiff was examined at Duke by Dr. Francis Keefe. Dr. Keefe recorded this assessment of plaintiff's condition: "Pain is constant. Increases with activity. Decreases most with heat and bedrest" (Tr. 205). Subsequent observation revealed that plaintiff did not always comply fully with the prescribed regime while at the clinic. For example, he complied poorly with his exercise program (Tr. 202). However, no doubt was ever expressed about the severity or authenticity of plaintiff's pain. Plaintiff's Duke discharge summary, compiled by Dr. Randal

France on July 2, 1983, indicated that laboratory data showed chronic L5–S1 and S1–2 radiculopathy/bilateral. Dr. France recorded plaintiff's complaints of pain in his left buttocks radiating down his left leg to his foot. The pain, aggravated by activity and relieved by rest, was recorded as sharp (Tr. 201). Dr. France's discharge diagnoses were: chronic pain syndrome, status post laminectomy times two, obesity, hypertension and depressive reaction (Tr. 202).

On August 12, 1983, Dr. France, plaintiff's attending Pain Clinic physician and assistant professor of psychosomatic medicine at Duke, concluded:

"At present, Mr. Smith continues to complain of pain and there appeared to be no surgical intervention warranted to treat his pain problem. For this reason, a conservative treatment approach including regulation of medications, regulation of activities, physical therapy, biofeedback and pain management group was recommended. At present, Mr. Smith continues to complain of having quite a bit of pain despite his compliance to a pain management program. Presently, he is only able to sit or walk for approximately twenty minutes out of each hour. When he tries to increase this amount of time, there is a sharp increase in his pain problem. It is impossible to state at this time whether he would be able to increase this amount of activity. Based upon this activity level, I would state that he is not able to hold down a part-time or full-time job and I would feel that he is disabled. I would also state that this is for an indefinite period of time."

(Tr. 211.)

On September 29, 1983, in an out-patient progress report, Dr. France observed:

"Mr. Smith states that he has been much more active. He has gotten married over the last month and has a lot of moving and has had a significant increase in his activity. He has not been sticking with his activity/rest cycling, minimum use of physical therapy, and occasional use of biofeedback techniques.... Spirits improved. Sleeping okay. Appetite normal. Weight stable...

"Affect improved. Pain behaviours present.

"1) Chronic low back pain, basically stable. Increase in pain level secondary to overactivity."

(Tr. 213.)

On May 7, 1984, Dr. France sent plaintiff's attorney a synopsis of his evaluations of plaintiff's condition since his admission to the Duke Clinic:

"Mr. Smith was last seen in the Duke Pain Clinic on December 1, 1983, which was his third outpatient visit since discharge from the Clinical Specialty Unit where he was admitted for treatment of his chronic low back pain, status post laminectomies.

"After his discharge, on his first outpatient visit he reported that he was doing well with an improvement in his sleep, activity and pain levels. We recommended at that time that he continue on his pain management program including Elavil 200 mg. h.s., weight reduction program, pain medications, biofeedback and physical therapy. He was seen again on September 29th and December 1, 1983. During those clinical visits he was not doing as well as his first outpatient visit after discharge from the hospital. Mr. Smith reported an increase in pain in his lower back and leg and consequently, he had to discontinue some physical therapy secondary to his pain and felt that he was 'losing ground.'

"It appears that Mr. Smith has reached a level of deterioration that is equal to his admitting clinical condition to the hospital. It was our impression on his last visit that he has reached a maximum level of improvement and would consider him disabled at this point. I would not anticipate any further improvement in his clinical condition. The primary goal of treatment is just management of his pain problem."

(Tr. 232.)

## THE ALJ'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

The ALJ found that plaintiff could perform sedentary work. According to 20

C.F.R. § 404.1567(a), sedentary work is defined as follows:

>  (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Plaintiff's testimony and the medical evidence from the Duke Pain Management Clinic reveal that plaintiff can only cope with his back pain by frequently alternating between reclining, sitting and standing. Plaintiff's frequent need to lie down after even a short period of activity in order to lessen his pain to a tolerable level severely limits his residual functional capacity in a manner ignored by the ALJ. Based on his familiarity with plaintiff's pain management program, one of plaintiff's treating physicians, Dr. France, has stated that he believes plaintiff is totally disabled. However, his opinion was not given the appropriate weight by the ALJ despite the absence of persuasive contradictory evidence. *Mitchell v. Schweiker,* 699 F.2d 185 (4th Cir.1983).

■ The only medical testimony that plaintiff is capable of performing sedentary work comes from Dr. Spain, who performed one consultative examination of the plaintiff for the Social Security Administration. Dr. Spain's evaluation cannot be considered persuasive contradictory evidence because he failed to consider the effect of plaintiff's constant pain on his residual functional capacity. Pain itself can be disabling, and it is incumbent on the ALJ to evaluate the effect of pain on a claimant's ability to function. *See Myers v. Califano,* 611 F.2d 980 (4th Cir.1980).

In addition, the ALJ's treatment of the effect of plaintiff's constant pain on his ability to work does not conform to the guidelines outlined in the revised pain standard of the Disability Benefits Reform Act of 1984, 42 U.S.C. § 423(d)(5)(A) (West Supp.1985):

>  "An individual's statement as to pain or other symptoms shall not alone be conclusive. There must be medical signs and findings, established by medically acceptable clinical and laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain ... alleged and which, when considered with all evidence required to be furnished ... (including statements of the individual or his physician as to the intensity and persistence of such pain ... which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability."

The Third Circuit has recently interpreted this new standard to require medical evidence of a condition that could reasonably produce pain, not objective evidence of the pain itself or its severity. *Green v. Schweiker,* 749 F.2d 1066, 1071 (3rd Cir. 1984). This case clearly presents medical findings documenting a condition to which plaintiff's pain can reasonably be attributed. The fact that plaintiff has been affected psychologically by his constant pain and has become depressed and anxious about his condition in no way discredits the ample evidence that plaintiff suffers from degenerative disc disease and scar tissue/bone spur pressure on his lumbar nerve roots.

■ Plaintiff established by substantial evidence that his pain is constant. It may be reduced by his pain management program, but it is never relieved, even at rest. In resorting to a mechanical application of the grids in this case, the ALJ failed to consider that the plaintiff's constant pain could be classified as a non-exertional impairment. Compare *Hammond v. Heckler,* 765 F.2d 424 (4th Cir.1985) (noting that constant severe back pain similar to plaintiff's should be considered as possible non-

exertional impairment). Constant pain can be classified as a non-exertional impairment under the analysis of *Gory v. Schweiker*, 712 F.2d 929 (4th Cir.1983). When substantial evidence demonstrates the existence of a non-exertional impairment, as it does in this case, the grids become only guides for the evaluation of plaintiff's work capacity. *See Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir.1984). Here, the ALJ failed to give individualized consideration to and make specific findings about the effect of plaintiff's non-exertional impairment on his residual functional capacity, as required by *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir.1983). The plaintiff's pain and the program designed to minimize it restricts him from performing the full range of activity covered by the sedentary work categorization. The record will not support a conclusion that plaintiff can perform the full range of functions necessary to do sedentary work. *Wilson, supra; Hall v. Harris*, 658 F.2d 260, 266 (4th Cir.1981).

The decision of the Secretary affirming the decision of the ALJ should be reversed.